UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

            Plaintiff,

                                          Case No. 17-cr-175-pp

    v.

TERRENCE L. JACKSON,

            Defendant.

---

## ORDER DENYING WITHOUT PREJUDICE MOTION FOR *DE NOVO* REVIEW AND BOND PENDING TRIAL (DKT. NO. 193)

---

Defendant Terrence L. Jackson, who has been in custody since September 27, 2017, has filed a motion asking this court to schedule a hearing for a *de novo* review of Magistrate Judge David Jones's orders detaining him pending trial. Dkt. No. 193. The court has reviewed the extensive record, and will not conduct a hearing or order the defendant's release at this time.

## I.    Background

The defendant was arrested on September 27, 2017, on a complaint alleging that he and others were involved in drug dealing. Dkt. No. 1. At his initial appearance, Judge Jones temporarily detained the defendant pending a detention hearing. Dkt. No. 4. On September 29, 2017, the pretrial services department filed a prior record memo dated September 27, 2017. Dkt. No. 36. The memo indicated that the defendant's arrest history began when he was 13; at that age alone, he had been referred to juvenile authorities after arrests for weapons violation, retail theft, manufacture/deliver drugs and possession of

marijuana. Id. at 2. At age 14, he had referrals after arrests for possession of controlled substances, possession with intent to deliver cocaine and resisting/obstructing. Id. At age 17, he was arrested for robbery/use of force and a curfew violation (the robbery charge was not prosecuted), loitering/operating after revocation and possession with intent to deliver narcotics (which was not prosecuted). Id. at 3. At age 18, he received sixty days in the House of Correction for possession of marijuana, and was arrested for loitering and endangering safety by use of a dangerous weapon; he also received a fifteen-month stayed sentence for driving a vehicle without the owner's consent. Id. The report notes that the defendant was released on a cash bond pending resolution of the last case, but failed to appear and a warrant issued. Id. at 4. At age 19, he was convicted for possession of cocaine with intent to distribute; he was arrested under the alias Michael Ray Jackson, and his extended supervision eventually was revoked. Id. Also at age 19, he was convicted on a retail theft charge, for which he received six months in the House of Correction. Id. At age 20, he was arrested on charges of operating while revoked, fleeing/eluding an officer, armed robbery, failure to appear and bail jumping; the report indicates that he was sentenced to thirty-six months on the fleeing/eluding charge and two years on the bail jumping charge. Id. At age 22, he was convicted of perjury before the court and sentenced to one year in state prison; the ensuing extended supervision was revoked. Id. At age 26, he was arrested for armed robbery and probation violations. Id. at 5. At age 27,

he was arrested on various drug charges, but it appears he was not prosecuted. Id.

At age 34, the defendant was arrested for being a felon in possession of a firearm, id.; that charge remains pending in Milwaukee County Circuit Court, with a jury trial scheduled for October 8, 2018, State v. Jackson, 2016CF003660 (Milwaukee County), https://wcca.wicourts.gov. The bond report explains that the defendant was released on a $1,000 signature bond in that case—he violated "unknown conditions" and was released on a $500 cash bond, but then submitted a positive drug test. At that point, he was released on a $1,500 cash bond. He subsequently left a court hearing before the case was called, and the court issued a bench warrant. He was admonished and released, but then failed to appear at a subsequent hearing, and another warrant issued. At that point, the court set a $6,500 cash bond, which was posted. The court scheduled a subsequent bond hearing on allegations that the defendant had tested positive for Oxycodone and had absconded from Justice Point. Another warrant issued, and the defendant returned to court. Id.

Finally, the defendant had an August 2016 arrest for first-degree recklessly endangering safety, but was not prosecuted, and a June 2017 arrest for bail jumping and possessing a firearm after a felony conviction. The June 2017 arrest resulted in charges that are pending, id. at 6; that case, too, is scheduled for a jury trial on October 8, 2018, State v. Jackson, 2017CF002866 (Milwaukee County), https://wcca.wicourts.gov.

On October 2, 2018, ahead of the detention hearing Judge Jones had scheduled, pretrial services filed a report. Dkt. No. 42. At the time, the defendant was thirty-five years old, and had been living with his girlfriend Nicki Green; he wanted to live with her if released. Id. at 1. He reported working at a day care as a driver since December 1, 2015, indicating that he worked five days a week and got paid in cash. Id. at 2. He reported health problems, but could not name his health care provider. Id. He indicated that he'd previously been diagnosed with schizophrenia and bi-polar disorder and had been taking medications between 2012 and 2016, but stated that he stopped taking the medication because he did not think it was necessary. Id. at 3. He indicated that up until a year before his arrest, he'd been a daily user of marijuana and cocaine; he refused to submit to a drug screen at the time of the pretrial services interview. Id.

Judge Jones held a detention hearing October 2, 2017. Dkt. No. 54. At that hearing, the government explained that during a search warrant, law enforcement had found a loaded gun in the home of the defendant's girlfriend— a pistol with an extended magazine. Id. The government indicated its evidence showed that the defendant had been a courier (along with other people) for co-defendant Torrence Harris, who trafficked in heroin and cocaine. The government pointed to the defendant's history of bond violations and losing cash bond as evidence that he was a risk for failing to appear. The government also noted that because the charges against the defendant carried a maximum prison term of over ten years, there was a presumption that there were no

conditions of release that could assure the defendant's appearance or the community's safety. Id. The defendant's attorney conceded that he had failed to appear a few times in state court, but argued that he always appeared the next day. He pointed out that Justice Point showed two months with no violations, and that the pending charges were scheduled for trial. Id. Judge Jones noted the presumption of detention, and found that because the defendant had been in possession of a loaded gun with a round in the chamber while on release for the pending state charges, there was a real concern that the defendant did not comply with bond conditions. Id. He ordered the defendant detained. Id.

On October 17, 2017, the grand jury charged the defendant with two counts of possession with intent to distribute (one on May 2, 2017 and one on May 20, 2017) and one count of being a felon in possession of a firearm. Dkt. No. 98. About three weeks later, on November 8, 2017, the defendant filed his first motion for bail review. Dkt. No. 108. He asked Judge Jones to consider that the grand jury had not charged the defendant with a crime that carried a mandatory minimum penalty, that the government had indicated that the discovery would not be available for another four to six weeks, and that the defendant's family had posted some $12,000 cash bail in the state cases, which remained pending. Dkt. No. 108-1. The defendant's lawyer told the court that the defendant was willing to abide by GPS monitoring or home detention, and to submit to drug screens. Id. The following day, Judge Jones denied the motion for bail review without a hearing, finding that the motion did not

present sufficient grounds for him to reconsider his earlier decision. Dkt. No. 111.

On December 14, 2017—about a month later—the court received from the defendant himself a copy of the motion for bail review his lawyer had filed a month earlier. Dkt. No. 125. Judge Jones denied the motion a few days later, on December 18, 2017, noting that he'd already ruled on the motion when the defendant's lawyer had filed it, and admonishing the defendant that he should not be filing his own motions when he had a lawyer representing him. Dkt. No. 126. A week later, the defendant's lawyer filed a motion to withdraw, indicating that the defendant felt his lawyer was not adequately representing him. Dkt. No. 129. Judge Jones granted that motion on January 11, 2018, after a hearing in which he explained to the defendant why he had denied the defendant's motion for bond review, and why other defendants in the case had been released when the defendant had not been. Dkt. No. 133.

New counsel appeared for the defendant on January 16, 2018. Dkt. No. 134. Two months later, on March 12, 2018, the new lawyer filed a motion for bond—the defendant's third motion. Dkt. No. 154. Counsel argued that at the time of the first bond motion, the information in the bond study had not been verified; it now had been, and counsel argued that he could propose bond conditions more tailored to the defendant's history. Id. Counsel asserted that the indictment had "narrowed" the defendant's culpability, and also argued that other defendants who'd been charged with comparable offenses had been released. Id. Counsel pointed out that it had taken almost six months for the

government to provide the discovery, during which time the defendant had been in custody. Id. The defendant proposed that, rather than living with his girlfriend upon release (as he'd indicated he'd wanted to do during the pretrial services interview), he could live with Shacona Lottie, his employer at the daycare. He explained that Ms. Lottie had no criminal history, and was willing to act as a third-party custodian and to arrange for the defendant to obtain mental health treatment at Isaac Coggs. Id. Counsel pointed out that the defendant had not been charged in the conspiracy count of the indictment, and that the two substantive drug counts with which he had been charged were based solely on coded conversations captured on wire taps, and law enforcement's assumptions about what those conversations meant. Id. Counsel pointed out that co-defendants Jerry Gray and Phillip Edwards, who faced similar charges to those against the defendant, both had been released. Id. Counsel argued that while the defendant had been released on cash bond and Justice Point monitoring on the state charges, the defendant now was proposing that he submit to location monitoring, the oversight of a third-party custodian, drug testing, drug counseling and mental health treatment. Id.

On April 2, 2018, Judge Jones held a hearing on this third bond motion. Dkt. No. 162. At this hearing, the government asserted that it had charged the case conservatively. The prosecutor told Judge Jones that the wiretap had captured over sixty-five calls involving the defendant. The government reiterated that the gun found during the search of the defendant's girlfriend's home had an extended magazine and had been loaded. The government

reminded the court that in the past, the defendant had used aliases and had failed to appear for court hearings, and that he had mental health issues. Id. After hearing from the parties, Judge Jones emphasized the presumption in favor of detention, and noted that the defendant's criminal record made it difficult for him to rebut that presumption. Judge Jones noted that the defendant had reason to know that he was not supposed to have a gun given that he was on supervision for the state cases, and that he now had been charged with drug activity while on supervision. The notes from the hearing state that Judge Jones concluded by saying, "Will consider release if forensics on firearm indicate defendant has no link to it and if further developments in case show defendant not as involved." Id.

Less than a month later, on April 30, 2018, the defendant's lawyer filed a *fourth* bond motion. Dkt. No. 166. Counsel stated that the defendant had understood Judge Jones's comment about the forensic evidence to mean that if there was no forensic evidence connecting the defendant to the gun found in his girlfriend's house, the defendant would be released from custody. To that end, counsel recounted that the discovery contained a police report indicating that the police were going to process the gun for fingerprints and DNA. The defendant recalled that law enforcement had taken a DNA sample from him via a cheek swab. Counsel reported that the discovery he'd received did not reveal that law enforcement actually had done any forensic testing, and that his requests to the government for information about whether they planned to do any such testing had garnered no response. For all these reasons, counsel

concluded that there was no forensic evidence linking the defendant to the gun, and reiterated the defendant's request that Judge Jones release him on conditions. Id.

A few days later, on May 9, 2018, the court received a letter from Shacona Lottie. Dkt. No. 168. Ms. Lottie reported that she was willing to post her home as security for the defendant's release (although she conceded that she did not have much equity in the house). She also reiterated that she was willing to let the defendant work for her and live with her, and said that she even was willing to take the defendant to mental health therapy. Id.

Judge Jones held the third hearing on this issue on June 4, 2018. Dkt. No. 173. The government reported that law enforcement had found some DNA material on the gun found in the defendant's girlfriend's home, but that it was not enough to compare with the defendant's DNA sample (although law enforcement continued to review the issue). The prosecutor pointed out that it was rare to find DNA or fingerprints on guns, but stated that law enforcement continued to try to collect information. The prosecutor also repeated arguments the government had presented at the earlier hearings. The prosecutor added that the defendant's girlfriend—in whose home officers had found the gun— denied ever having seen the gun. The prosecutor also reported that law enforcement had recovered a text message in the girlfriend's phone which appeared to be from the defendant, in which he'd stated that he had left "his" gun in the glove box. Id. Counsel for the defendant told Judge Jones that Ms. Lottie was in court (the court heard from her later in the hearing). He reiterated

that there was no forensics evidence linking the defendant to the gun. He told the court that the text referencing the gun in the glove box appeared to be a text *to* a Georgia area code, and argued that it appeared that someone from out of town might have left the gun here and that the defendant was merely a "caretaker" for the gun. He asserted that the gun was not linked to drug trafficking. Id. Judge Jones instructed the government to reassess text messages and forensic information, and ordered that by June 13, 2018, the government should file a memorandum "clearing up" these issues. Id. Judge Jones explained to Ms. Lottie, in response to her concerns that other defendants in the case had been released when the defendant had not, that the defendant had a different criminal history than the defendants who were released, and that his prior record of supervision violations raised questions as to whether he could be trusted to comply with the conditions of release. Id. Judge Jones ordered "continued detention pending trial." Id. at 2.

On June 8, 2018, the defendant's lawyer docketed a letter, explaining that he had gone back through the text messages recovered from the girlfriend's phone, and that he'd been mistaken about the defendant being the *recipient* of the message about the gun in the glove box. He asked to withdraw his argument relating to that mistaken assertion. Dkt. No. 174.

On June 13, 2018, the government filed the update Judge Jones had requested regarding the text messages and the forensic evidence. Dkt. No. 176. The government first reminded the court that law enforcement had found the gun during a search of girlfriend's house—it was under a love seat/sofa in the

living room, loaded, with one round in the chamber and eleven rounds in the extended magazine. There were three teenagers present in the residence at the time of the search. Law enforcement also had recovered a 600-gram capacity digital scale, .45-caliber Winchester bullets, $2,003 in the defendant's shorts pocket and a shoe box, six cell phones and a small amount of marijuana. The government explained that the defendant's girlfriend had arrived at the residence during the search, and had told officers that the defendant had not been there the night before, that he had been working but not much, and that there should have been no guns or drugs in house because she didn't allow them. She stated that she knew nothing about the gun and never had seen it. The girlfriend gave the law enforcement officers her cell phone, which contained numerous messages between her and the defendant. Included in the message was a message sent September 18, 2017—nine days before search—in which the defendant said, "I left my gun in the glove box." The government recounted the series of texts between the two that preceded the September 18, 2017 message, and argued that this series supported the government's assertion that it was the defendant who sent the text about the gun in the glove box, and that he had referred to the gun as "his" gun. The government asserted that the defendant knew, at that point, that he was a felon and could not have a gun—he had been charged twice before with being a felon in possession of a firearm. Id.

Regarding the forensic evidence, the prosecutor confirmed that the defendant had submitted to a cheek swab, but that the amount of DNA

material on the gun was not sufficient to allow a comparison to the defendant's sample. The government reiterated that it is difficult to get DNA from guns. <u>Id.</u>

The government concluded by summing up all of its arguments against release—it asserted that the evidence indicated that the defendant was a "mid-level" drug dealer, had been on pretrial release in two state cases when he'd allegedly committed these offenses, had declined to submit to a drug screen at the time of his federal arrest, had an extensive criminal history (including charges for bail jumping and failure to appear, the issuance of three bench warrants and revocation of one term of extended supervision), and had been working at Ms. Lottie's when he was arrested (though not much) and that she had paid him in cash. <u>Id.</u>

A month later, on July 19, 2018, the defendant's second lawyer moved to withdraw due to a breakdown in communications. Dkt. No. 181. Judge Jones held a hearing on that motion on July 30, 2018. Dkt. No. 182. He granted counsel's motion, and asked Federal Defender Services to recruit new counsel for the defendant. <u>Id.</u> The defendant's third lawyer filed his notice of appearance on August 1, 2018. Dkt. No. 183.

On September 28, 2018, the defendant, through his new lawyer, filed his fifth bond motion for bond, this time asking this court—Judge Pepper—to schedule a hearing to conduct a *de novo* review. Dkt. No. 193. In the motion, counsel explains that the defendant is not charged in the conspiracy count of the indictment. He argues that the two substantive drug counts are based on law enforcement's interpretations of conversations captured on the wiretaps—

he says that there was no surveillance of the defendant, and there were no controlled buys of drugs from the defendant. He argues that even if one accepted that the two calls related to drugs, they involved only seventy-four grams of cocaine. With regard to the gun, counsel argues that the main evidence connecting the defendant to the gun is the text message to the girlfriend's telephone, and asserts that the defendant can defend against the allegation that he sent the text in several ways. Counsel argues that the defendant is accused of possessing smaller amounts of drugs than co-defendants Edwards or Gray, and that co-defendant Page has been charged with possession of heroin, and had five pending charges at the time of his arrest. Yet, he argues, all three of those defendants have been released, while the defendant remains in custody. Id.

## II. Analysis

### A. Applicable Law

If a magistrate judge orders a defendant detained, the defendant may ask the district court to review that order. 18 U.S.C. §3145(b). The person also may appeal the detention order. 18 U.S.C. §3145(c). The district court reviews the magistrate judge's decision *de novo*. United States v. Fisher, Case No. 08-cr-161, 2009 WL 10677133 at *1 (E.D. Wis. June 12, 2009) (citing United States v. Portes, 786 F.2d 758, 761 (7th Cir. 1985)). The district court is not required, however, to conduct a *de novo* hearing. Id. (citing United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991)).

Section 3142(b) of the criminal code states that a judge shall release a defendant on a personal recognizance or unsecured appearance bond "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." Section 3142(c) lists conditions that the judge can impose to try to address any such concerns. Section 3142(g) requires the court to consider specific factors in deciding whether any such conditions will address the concerns, including the nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the defendant, and the nature and seriousness of the danger to the person or community posed by the release. If, after a hearing, the judicial officer concludes that no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of any other person or the community, the judicial officer shall order the defendant to be detained. 18 U.S.C. §3142(e)(1).

In cases where the defendant has been charged with a drug offense that carries a maximum term of ten years or more in custody, 18 U.S.C. §3142(e)(3)(A) requires the court to presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community. The Seventh Circuit has provided guidance on how this "rebuttable presumption" works. Once a court finds that there is probable cause that the defendant committed the drug crimes that give rise to the presumption, the defendant is not required to rebut

the presumption that drug trafficking is dangerous, or even to rebut the court's conclusion as to probable cause. United States v. Dominguez, 783 F.2d 702, 706 (7th Cir. 1986). Rather, the defendant must rebut the presumption that there is no combination of release conditions that will, in the future, reasonably ensure the safety of the community. Id. at 707. The Seventh Circuit made clear that "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of . . . the presumption[], including evidence of [the defendant's] marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3)." Id. The court cannot base its decision on dangerousness on the fact that the defendant has been a danger in the past, "except to the extent that his past conduct suggests the likelihood of future misconduct." Id. The defendant "rebuts" the presumption when he "meets a 'burden of production' by coming forward with some evidence that he will not flee or endanger the community if released." Id. This "burden of production" "is not a heavy one to meet." Id. Once the defendant comes forward with such evidence, the burden remains with the government to persuade the court that the defendant is a danger or poses a risk of non-appearance. Id.

B.    Probable Cause Determination

The court finds that there is probable cause to believe that the defendant committed the two drug possession crimes charged in the indictment. The government has recounted the conversations recorded on the wiretap which form the basis of the two charges. It has explained what it believes, based on

the agents' experience and knowledge of the investigation, what the defendant and his co-defendant Harris were discussing in those conversations. It has proffered that these were not the only two conversations between the men. It also has provided evidence that the search of the defendant's girlfriend's apartment yielded a 600-gram capacity digital scale (a common tool of the drug trade), over $2,000 in cash in clothes belonging to the defendant (who was working—sporadically, possibly—as a driver for a day care), and six cell phones (four to five more than most people own and use; use of multiple cell phones being another common feature in the drug trade), and a small amount of marijuana.

Courts use a "flexible, common-sense standard" in determining probable cause. Florida v. Harris, 568 U.S. 237, 240 (2013) (quoting Illinois v. Gates, 462 U.S. 213, 239 (1983)). In determining probable cause, one looks at the "totality of the circumstances," and looks to an "assessment of probabilities in particular factual contexts . . . ." Id. (citing Illinois v. Gates, 462 U.S. at 232, 238). The question is whether the evidence indicates a "fair probability" that the defendant committed the charged offense, the kind of probability "on which 'reasonable and prudent [people], not legal technicians, act." Id. (citing various cases).

The government has demonstrated that there is a fair probability that the defendant committed the two drug offenses, and that means that the rebuttable presumption applies.

C.     Defendant's Information Rebutting Presumption

The defendant has met the light "burden of production" to rebut the presumption. At the first detention hearing, his attorney conceded his failures to appear in state court, but asserted that the defendant always had appeared the next day. Counsel also pointed to the fact that Justice Point's records showed that the defendant had had no violations over a two-month period. In the first motion for bail review, the defendant's lawyer argued that his family was supportive of him, having posted some $12,000 in cash for his release on the state charges. He also proposed conditions—GPS monitoring, home detention, drug screens—that the court could consider. In the third motion for bail review, the defendant's new lawyer told the court that the defendant's employer, Shacona Lottie, was willing to act as his third-party custodian, to allow him to live with her and to arrange for him to obtain mental health treatment; he explained that Ms. Lottie had no criminal history. Ms. Lottie also provided the court with a letter, confirming that she agreed to do these things, and she spoke to Judge Jones in court. In the letter he filed after the third detention hearing, counsel argued that there was no forensic evidence—no fingerprints or DNA—connecting the defendant to the loaded gun found during the search of his girlfriend's home. The defendant's third lawyer has reiterated all these points in his motion for *de novo* review.

The court finds that this information is sufficient to rebut the presumption created by §3142(e)(3)(A).

D.    §3142(g) Factors

With the presumption rebutted, the court turns to the §3142(g) factors to decide whether there are any conditions that will reasonably assure the defendant's appearance and the safety of others and the community.

1.    *The nature and circumstances of the offense charged*

As noted, the grand jury charged the defendant with two substantive drug counts and possession of a firearm by a felon. It did not charge the defendant with a crime of violence, a violation of 18 U.S.C. §1591, a federal terrorism crime or a crime involving a minor victim—some of the offenses 18 U.S.C. §3142(g)(1) calls out for concern. The grand jury did, however, charge the defendant with crimes that involve a controlled substance, and a crime involving a firearm. The statute identifies those kinds of crimes as cause for concern, as well.

The defendant has argued in his various motions that he was not charged in the conspiracy—arguably, a more serious charge—and that the amount of cocaine involved in the two substantive counts against him is small by comparison to others. Both these facts appear, as far as the court can tell, to be true. Nonetheless, there is probable cause to believe that he was involved in two drug offenses, and that he was involved with a co-defendant against whom there appears to be much more evidence. The drug offenses carry a maximum penalty of up to twenty years in prison; regardless of amount, they are serious charges.

Regarding the gun, the defendant has argued that there is no evidence that he used the gun found in his girlfriend's home against anyone, or that he used it in connection with a drug offense. As far as the court can tell, that is also true. But the statute requires the court to consider whether the defendant was charged with any crime involving a firearm, and he was. There is no dispute that the gun the defendant is alleged to have possessed was loaded, had an extended magazine and had eleven rounds in the magazine. It was in a residence with three teenagers, where officers also found a digital scale and good sum of money. And there is no dispute that, as a felon, the defendant was prohibited from possessing, owning or controlling guns.

2.    *The weight of the evidence against the defendant*

The defendant has argued repeatedly that the government's evidence is weak. He asserts that the drug charges are based solely on two intercepted telephone calls, which the government asserts involved the defendant and Torrence Harris. The defendant asserts that to believe that these conversations involved drug deals, one must rely solely on the government's contention that the conversations are in code, and must rely on the agents' interpretation of what the alleged coded words mean. He has argued that the government has no surveillance evidence against him, and that no informant or agent conducted controlled buys of drugs from him. Again, he has argued that the government did not charge him in the extended conspiracy.

The defendant ignores the fact that during the September 27, 2017 search of the residence he shared with his girlfriend, agents found a 600-gram

digital scale, over $2,000 in cash and six cell phones. These items were in the couple's bedroom—the scale wasn't in a kitchen cabinet (and most cooking scales have much larger capacities), $2,000 is more "pocket change" than most people carry, and six cell phones is excessive even for two people.

Still, the court has seen cases in which drug charges were supported by more extensive evidence. Proving beyond a reasonable doubt that a defendant's allegedly coded conversation was really a drug deal can be more difficult than meeting that burden with evidence of a controlled buy, even with other indicia of drug trafficking. At this stage, with only the information before the court, the evidence as to the drug charges is not the strongest the court has seen.

The evidence regarding the gun, however, is stronger. According to the defendant's girlfriend, Ms. Green, she and the defendant had been together for over a decade, and had lived together at the address where the search took place for at least two and a half years. When the officers entered the residence on September 27, 2017, they found the loaded Ruger .380 (with the extended magazine) in the living room, under the love seat or sofa. The gun was loaded; it had a round in the chamber, and eleven rounds in the magazine. The defendant was in the residence, in a child's bedroom with Ms. Green's teenaged daughters and niece. Ms. Green told the officers that there should not be any guns in the house, that they gun they'd found was not hers, and that she had never seen it before. As noted, the agents also found the scale, the cash and the cell phones. When the agents investigated Ms. Green's cell phone, they found the text from telephone number (414) 888-9334—Ms. Green said that

was the defendant's number—which read, "I left my gun in the glove box." She received that text nine days before the search of the residence.

The defendant read much into Judge Jones's comments about whether there was any forensic evidence linking the gun to the defendant, and asserts that no such evidence exists. The government says it's still looking, but concedes that while there was DNA on the gun, it wasn't enough to compare to the defendant's sample. This court is not surprised by the lack of DNA or fingerprint evidence on the gun. In the court's experience (gained during a year as a federal law clerk, seven years as a federal prosecutor, eight as a criminal defense attorney, and four as a district court judge), it is uncommon for law enforcement to recover such evidence from guns. Depending on the type of gun, the surface can be oily or greasy. The surface can be textured, particularly grips or stocks. It is easy for the user of a gun to smear or blur prints in handling the gun. And of course, some people don't secrete the oils that create fingerprints. One doesn't necessarily spit on, or bleed on, or shed skin on, a gun when holding it, providing less opportunity to leave DNA material behind.

The court concludes that the evidence connecting the defendant to the loaded Ruger recovered on September 27, 2017 is significant, and there is no dispute that the defendant was prohibited from possessing guns on that date.

3.    *The defendant's character and other characteristics*

Section 3142(g)(3)(A) provides a laundry list of personal characteristics for the court to consider: character, physical and mental condition, family ties, employment, financial resources, length of residence in the community,

21

community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings.

a.    Character

The main evidence of the defendant's character comes from his employer, Ms. Shacona Lottie. She wrote to Judge Jones, describing the defendant as a "well-liked, dependable and responsible environmental specialist and driver" for her since 2015. Dkt. No. 168. She indicated that she believed in the defendant so much that she was willing to put her house up for bail, to let him keep his job, to let him live with her and to take him to mental health therapy. She described the defendant as a huge asset to her business, and said that she "s[aw] good in him." Id. The court received this letter on May 9, 2018, so it appears that Ms. Lottie had known the defendant for approximately three years. The defendant also has emphasized that his family believes in him, as evidenced by the fact that they posted significant sums of money to bail him out on his state charges. The court does not have any evidence of who posted the bail. The bond study indicates that the defendant's mother lives in Green Bay and that his father lives in Chicago, but that he has three sisters and one brother who live in the Milwaukee are. None of those siblings have contacted the court formally, nor has his girlfriend of eleven years, Ms. Green.

b.    Physical and mental condition

The defendant reported to pretrial services that he has skin cancer on two areas of his body. He reported that he had been receiving treatment from a clinic in Milwaukee, but wasn't able to identify his health care provider. He also

reported "ongoing back pain issues." Dkt. No. 42 at 3. The court does not know if pretrial services was able to verify either of these issues.

The defendant also reported to pretrial services that he had been diagnosed with schizophrenia and bi-polar disorder. He said that he had been in Milwaukee County Mental Health Complex on one occasion, for a day, but could not recall when. He reported that although he had taken medications for the schizophrenia and bi-polar disorder, he had stopped taking them in 2016 "because did not feel they were necessary." Id.

c.    Family ties

As indicated above, the defendant's mother and father are living, but neither live in Milwaukee. He has four siblings in Milwaukee. Ms. Green reports that she and the defendant have been in a relationship for eleven years. The defendant told pretrial services that he had two children—ages 19 and 15—who "reside in Milwaukee with their respective mothers." Id. at 1.

d.    Employment

At the time of the bond study, the defendant was 35 years old—by now, he likely is 36. The only job the court is aware of in the defendant's 36 years is his job at Shakona's Day Care, working for Ms. Lottie. They both report that he had had that job since 2015 (the defendant indicated that he started the job December 1, 2015, meaning that by the time of his arrest, he'd been working there twenty-one months). The defendant told pretrial services that he worked five days a week, picking children up in the morning and dropping them off in the afternoon; he said he was paid in cash, and reported income of $600 per

month. Ms. Lottie referred to the defendant as both a driver and an "environmental specialist;" it is not clear what an environmental specialist does. Ms. Green confirmed that the defendant worked, but said he didn't work very much; this comports with the defendant's report that his sole responsibility was to pick kids up in the morning and drop them off in the afternoon, and with the fact that his income was only $600 a month. The defendant does not appear to have a significant employment record.

    e.   Financial resources

  The defendant reported income of $600 per month and expenses of $300, for monthly cash flow of $300. As noted, he had over $2,000 in his clothes when the agents searched his residence. Over the years, someone—whether it was the defendant or family members or friends—has posted significant amounts of money to bail him out in various state cases. The defendant appears to have very little legitimate income, but access to money.

    f.   Length of residence in the community

  The defendant reported to pretrial services that he was born in Chicago. He reported that he'd lived in the community (presumably Milwaukee) for twenty-three years, and that he'd been involved with Ms. Green for eleven years. Ms. Green indicated that the defendant had been living with her for about two and a half years.

    g.   Community ties

  Other than his family, his girlfriend and his job at the day care, the court has little information about any community ties the defendant might have.

h. Past conduct

The information the court has about the defendant's past conduct relates to his criminal history, which the court discusses further on.

i. History relating to drug or alcohol abuse

The defendant reported using marijuana and cocaine daily between age twelve and age thirty-three. He refused to submit to a drug screen at the time of the bond study. He reported participating in drug treatment during a prior prison term, and voluntarily attending AA and NA meetings in the community.

j. Criminal history

The defendant has an extensive criminal history, dating back to age 13. Of the six arrests he had as a juvenile, one involved a gun and four involved drugs; the sixth was for retail theft. The pretrial services report says only that these cases were referred to the juvenile authorities; the court does not know if he was adjudicated on any of them. But the pattern of arrests is disturbing.

The defendant has had some arrests for which pretrial services could not determine the disposition, including arrests for loitering, curfew violations, endangering safety with the use of a dangerous weapon, failure to appear and possession of cocaine with intent to distribute. He has had other arrests which resulted in no prosecution, including arrests for robbery with the use of force, possession with intent to distribute narcotics, armed robbery, operating while revoked, recklessly endangering safety, possession of a firearm by a prohibited person and possession of marijuana. In some instances, the entire case was dismissed; in others, it appears that the state did not prosecute the defendant

on one of several charges and convicted on others. The court does not assume that the defendant committed these offenses, but it is concerning that several of the arrests involved drugs or firearms—the kinds of offenses with which the defendant has been charged in this case.

That leaves the confirmed convictions. The first occurred when the defendant was eighteen, and was sentenced to serve sixty days in the House of Correction for possession of marijuana. This does not appear to have been a serious offense, but it was a drug charge, and agents in this case found marijuana in the defendant's residence during the search. The second conviction also occurred when the defendant was eighteen—he received a stayed sentence of fifteen months for operating a vehicle without the owner's consent. That is the case in which he was released on a $1,000 cash bond, but failed to appear. The court had to issue a bench warrant to secure his appearance.

A little over a year later, the defendant was arrested for, and convicted of, possessing cocaine with the intent to distribute. That is one of the charges he faces here. He received a sentence of eight months in custody and twenty months on extended supervision. When he was arrested, he was using an alias, and he ended up having his extended supervision revoked. Only five months after this arrest, the defendant was arrested for retail theft, and was sentenced to six months in the House of Correction.

About six months later, the defendant was arrested on charges of operating after revocation, fleeing/eluding an officer in a vehicle, armed

robbery, three counts of failure to appear, and bail jumping. He was not prosecuted on the operating-after-revocation and armed robbery charges, and pretrial services did not know the disposition of the failure-to-appear charges. But he was sentenced to thirty-six months in prison on the charge of fleeing/eluding and officer, and two years on the bail jumping count.

Five months after that arrest, the defendant was arrested on a charge of perjury before a court. He was sentenced to a year and six months in custody, followed by two years and six months of extended supervision; that extended supervision later was revoked.

At this point, there is a twelve-year gap between convictions. The defendant had several arrests during that time, but as noted, either he was not prosecuted on the charges or pretrial services was not able to determine a disposition.

In July 2016, the defendant was arrested for being a felon in possession of a firearm. That is one of the two cases that remains pending, and is scheduled for trial this month. Over the course of less than a year, the defendant violated the $1,000 signature bond, violated a $500 cash bond, left court before his hearing while on a $1,500 cash bond (and a warrant issued), violated his bond again, failed to appear (and a warrant issued), and failed to appear on violations (including an allegation that he absconded from Justice Point) while on a $6,500 cash bond (resulting in another bench warrant). In June 2017, about two weeks before his last failure to appear in the above case,

the defendant was arrested for being a felon in possession and for felony bail jumping; this is the other case that is pending for trial this month.

The defendant's criminal history is the kind of past conduct that is a disturbing predictor for his future conduct. The defendant has a consistent history of arrests, many for the types of crimes charged in this case. He has a history of failing to comply with the conditions of bond or supervision, and being revoked. He has a history of allegations that he used drugs while on release. Cash bond does not appear to have acted as a deterrent to his violating his release terms, or failing to appear. He has a history of failing to appear for court hearings. The defendant's first attorney told Judge Jones that even when the defendant failed to appear for a scheduled court hearing, he'd come in the next day. The court has no way of knowing whether this is true or not, but even if it is true, it does not explain why he failed to appear when he was supposed to. This factor, as Judge Jones pointed out at one of the bond hearings, weighs heavily against the defendant.

> k.    Record of appearing at court proceedings

As the court noted above, the defendant's record in this regard— particularly his recent record in one of the cases pending for trial in state court—is not good.

> l.    Whether the defendant was on release at the time of the current offense

Finally, §3142(g)(3)(B) requires the court to consider whether, at the time of the offenses charged in this case, the defendant was on probation, parole or release pending some other court proceeding. He was. Counts 19 and 20 of the

indictment allege that the defendant committed the two substantive drug offenses on May 2, 2017 and May 20, 2017. At that time, the defendant was on release for the July 2016 felon-in-possession case—the one in which he had so many bond violations and failures to appear. These alleged drug transactions took place approximately a month before the defendant was arrested on the June 2017 felon-in-possession and bail jumping charges pending in state court. The search of the defendant's apartment took place on September 27, 2017—at that time, both the above charges were pending, and the defendant had been under the supervision of Justice Point.

### 4. *The Nature and Seriousness of Risk*

Finally, §3142(g)(4) requires the court to look at the nature and seriousness of the danger that the defendant's release would pose. While the Seventh Circuit has instructed that the court can't just conclude that the defendant poses a danger because he has been dangerous in the past, but it can look at past conduct as a predictor of future conduct. The defendant's record predicts that he is likely to continue his involvement with drugs, and drug trafficking poses a known danger to the community (evidenced, among other things, by the rebuttable presumption). As early as age thirteen, he had arrests for possession of controlled substances, including marijuana and cocaine. He has a cocaine conviction, and the charges in this case involve cocaine.

In that same vein, the defendant also has diagnoses of two potentially serious mental health problems, schizophrenia and bi-polar disorder. Left

untreated, these illnesses can impact a person's judgment and impulse control—two necessary components of controlling one's behavior. It is concerning that the defendant reported to pretrial services that he'd stopped taking his prescribed medications because he did not think he needed them. This is an indicator that he does not cooperate in his own treatment.

The record contains evidence that the defendant also is a drug user, which poses a risk to the community. He admitted to daily use of cocaine and marijuana during the bond interview, but refused to submit to a drug screen. Although he appears to have had drug treatment, that did not address the issue. The records relating to his felon-in-possession charge in state court include several alleged bond violations for positive drug screens, including an allegedly positive screen for an opioid. This information predicts that the defendant is likely to continue using if released on bond, which poses a risk to the people around him.

The defendant's record predicts that he will continue to participate in criminal activity in general if released. His record implies that he has been involved in criminal activity fairly consistently throughout his adolescence and adulthood, and that the criminal activity has been varied. There is an indication that it sometimes has been violent. Being on cash bond, or under supervision, or subject to drug screening, has not deterred that behavior—the defendant is charged in this case with possessing a loaded handgun with an extended magazine while on release on a charge of being a felon in possession. The defendant is entitled to a presumption of innocence, but the court must

consider the nature of the current offense in making a dangerousness determination, and it is dangerous for someone to possess a loaded gun when he knows he is prohibited from doing so, and when there is evidence that he is involved in trafficking cocaine.

E.     Proposed Conditions

The §3142(g) analysis weighs against release. But the statute requires the court to consider whether there is any condition, or any combination of conditions, that could reasonably assure the defendant's appearance and assure that he is not a danger to the community. Given that, the court must consider the proposed conditions of release in its analysis.

The defendant has argued that he would be willing to submit to GPS monitoring or home detention. These conditions would allow pretrial services to know where the defendant is at a given time. They would not, however, prevent him from dealing drugs, or from using drugs, or from engaging in criminal activity.

The defendant has indicated that he would participate in drug testing and drug treatment. But the defendant was subject to drug testing through Justice Point while on release for the felon-in-possession charge, and records from that case indicate that he had several alleged violations for positive drug tests. He reported to pretrial services that he'd had drug treatment, and had attended NA meetings on his own; this did not appear to prevent either his drug use or his criminal activity.

The defendant and his employer, Ms. Lottie, both have proposed that he live with Ms. Lottie, and that she act as his third-party custodian. Ms. Lottie even indicated that she would be willing to post her home as collateral, but stated that it did not have sufficient equity. This proposed condition suffers from the same flaw as the location monitoring or GPS condition—it could not assure that the defendant would not be involved in criminal activity. Ms. Lottie works—she must run her day care. She cannot be at home with the defendant all the time. Even if she could, her presence would deter the defendant from committing crimes only to the extent that he respects her and wants to avoid getting her into trouble. It appears that in the past, the defendant's friends or family have posted cash bail for him—putting their own money at risk—and that has not stopped him from violating his release conditions. There is no indication that he would have any more respect for Ms. Lottie than he has had for his friends and family.

The defendant has proposed that he would attend mental health treatment, and Ms. Lottie has said that she would get him there. This is a positive sign that the defendant acknowledges that he has issues that he needs to address. But he had medication before, and stopped taking it.

The court appreciates that the defendant has attempted to propose a combination of conditions that would address the concerns Judge Jones and the government have addressed. But weighing the indicators of dangerousness against the proposed conditions, the indicators of dangerousness weigh more heavily. The defendant is an adult in his mid-thirties who, at the time of his

arrest, worked a job that required only a couple of hours a day of his time and paid him very little. He was a daily drug user, with a diagnosed mental health need that he wasn't treating. It is not clear how much of a support system he has in Milwaukee, other than Ms. Lottie. He has a history of bail jumping and failure to appear, a conviction for committing perjury before a court, and a history of violating bond. And his extensive criminal history predicts a likelihood of continued criminal activity should he be released.

 F. Co-Defendants

 Several times, the defendant has raised the fact that some of his co-defendants, who he sees as equally culpable, have been released. Ms. Lottie also raised this issue. The defendant has identified co-defendants Jerry Gray, Phillip Edwards and Royel Page. While the question of whether one's co-defendants have been released is not a factor under §3142(g), the court understands that the defendant feels that it is unfair that he is being detained when these other defendants are free.

 The indictment charged Jerry Gray with three counts of possession of drugs with intent to distribute. Count Twenty-Three alleges that he possessed cocaine with intent to distribute from July 7 through July 9, 2017. Dkt. No. 98 at 7. It alleges that he possessed heroin and cocaine with intent to distribute on July 17, 2017. Id. at 8. And it alleges that he possessed heroin and cocaine with intent to distribute on September 27, 2017. Id. at 12. Defendant Gray has a criminal record, but it is not as extensive as the defendant's, and his last conviction was over three years prior to the events alleged in the indictment.

Like the defendant, Defendant Gray had a substance abuse problem, but he asked the court to release him to inpatient, residential drug treatment, and probation reported that there was a bed available. Dkt. No. 115. Gray's attorney reported that he had a long history of employment. Id. The government opposed Gray's release. Judge Jones released Gray to inpatient treatment, with the condition that he be detained once his treatment was complete, and return to court for consideration of whether he could remain on release. Id. That was on November 15, 2017. On January 16, 2018, Gray returned to court, having completed the inpatient treatment. Dkt. No. 135. The government continued to oppose release. Judge Jones found that Gray had exhibited discipline during treatment, and had complied with release conditions; he concluded that the treatment mitigated his concerns about Gray's addiction and drug use. Id. The docket does not show any problems or issues since.

The indictment charged Phillip Edwards with possession cocaine with intent to distribute on June 19, 2017 and possessing heroin and cocaine with intent to distribute on September 27, 2017. Dkt. No. 98. He had verified employment as a barber. He reported drug use. He had a criminal history, but it was not as extensive, or as serious—several of his convictions resulted from his driving after his license had been revoked, and he had only one bail jumping conviction. Phillips had no mental health issues. Judge Jones originally ordered Edwards detained (as he had Gray), and the government opposed detention (as it had with Gray). Contrary to what the defendant has

asserted, however, the government did not report that Phillips was a suspect in a homicide. It reported that he had called co-defendant Torrence Harris the day two homicides had occurred. Dkt. No. 113 at 2. Judge Jones released Phillips to the third-party custodianship of his girlfriend of ten years, with whom he had two children, with GPS monitoring. Id. The docket shows no issues since.

The indictment alleged that Royel Page possessed heroin with intent to distribute on April 2, 2017 and July 11, 2017. Dkt. No. 98 at 6. He had no mental health history. His drug use was limited to marijuana. His criminal history was not as extensive as the defendant's. Judge Jones originally detained Page, but at the subsequent bond review hearing, the government did not oppose his release, as long as he participated in outpatient drug treatment for his marijuana use. Dkt. No. 106. On June 14, 2018, however, Judge Jones revoked Page's bond, and ordered him detained. Dkt. Nos. 177-178. Then Judge Jones released Page again after he proved valid employment. Dkt. No. 180.

It is difficult for a judge to make an apples-to-apples comparison of defendants—every person is different. But there are several distinct differences between the defendant and Gray, Phillips and Page. One glaring difference is that out of the four, the defendant is the only one charged with possessing a gun—and a loaded gun with a round in the chamber and an extended magazine, at that. The defendant's criminal history is more extensive than any of the three other defendants, and contains more indications of failure to appear and bond violations. The defendant was on bond for another crime at

the time of the offenses in the indictment. The defendant had a combination of untreated mental health issues, drug use and an extensive criminal history. While he, like Phillips, has a long-term girlfriend, one of the crimes he is charged with occurred in the house he shared with her, which meant that releasing him to her custody (even if she had offered it) was not an option. The third-party custodian the defendant did propose has known him for only a few years, in a limited context.

The court is aware that the defendant has been in custody now for a year, in a tough place (Waukesha County), and that there is no trial date on the calendar. But a thorough review of the defendant's situation, even giving no deference to any of Judge Jones's findings, convinces this court that there is no condition, or combination of conditions, that would assure his appearance or the safety of the community pending trial.

## III. Conclusion

The court **DENIES** the defendant's motion for a *de novo* hearing and review of the pretrial detention of the defendant. Dkt. No. 193.

Dated in Milwaukee, Wisconsin this 4th day of October, 2018.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge